Here the next case on the calendar, Cinema Village Cinemart vs. Regal Entertainment. Good morning. Good morning, Your Honors. Howard Alperin of Bleacher Collins Peppermint for the appellant Cinemart Village Cinemas. Let me start by saying that the Cinemart is a single family owned theater in Forest Hills in the borough of Queens, New York. Its sloped seating and modest admission prices are in sharp contrast to the Regal's Midway, which is a two-story stadium style multiplex. Regal has over 7,600 theaters in the United States and by virtue of this massive national circuit, it has successfully threatened major film distributors with a nationwide boycott of their films unless they agree to license first run films only to the Midway to the exclusion of the Cinemart. Cinemart submits... What's the basis? What's the basis? What makes that a plausible allegation? Well, as we've pled in the amended complaint, Cinemart's agent, Arthur Marblestone, has identified 12 individuals that have told Cinemart that they will not distribute films to them and only to the Regal's Midway because of Warner Brothers' concurrent licensing of American Sniper to the Cinemart and the Regal in 2015. So, we take those facts. We have also submitted a request for judicial notice that provides numerous other... Does that suggest or does it make plausible the conclusion that there was, in fact, an agreement? I'm sorry, Your Honor? That there was an agreement, that's my fault. Does that make it plausible? Yes, Your Honor. That makes it plausible and we add to that that there are other lawsuits in the country that we've identified in our request for judicial notice that other courts have found Regal's clearances to be a violation of the Sherman Act and on top of that, we have a Department of Justice investigation and the fact that Regal's clearance practices are being allowed to proceed in other litigation in this country, that State Attorney Generals are proceeding on claims and the Department of Justice has opened an investigation into Regal's clearance practices moves the case from possibly speculation to a plausible claim. You mentioned the Sherman Act and my understanding is that with respect to Sherman Act claims that you have to define a geographic market, correct? Correct, Your Honor. And that's where I'm having some trouble and I hope you can help me understand this. So, in your amended complaint, as I understand it, you define the relevant geographic market as the Forest Hills neighborhood of Queens, correct? Correct, Your Honor. And you say it's easily accessible by subway, rail, bus and car. But in other parts of the complaint, your emphasis seems to be on the borough of Queens as the relevant market. In the same paragraph, which is paragraph 23, you allege that, and I quote, it is not reasonably practical for the overwhelming majority of Queens residents to leave Queens to see movies on a regular basis even if prices in Queens increase significantly. And the amended complaint also seems to move the scope of the market saying that, and I quote, Regal residents from other cities or municipalities do not come often, do not come to Queens to see films. And that Regal has threatened and coerced film distributors in granting Regal exclusive clearances in Queens rather than Forest Hills. But I think that we can say that there are a number of other theaters that operate in Queens neighborhoods around Forest Hills. And if Forest Hills is easily reachable by subway, rail, bus and car from surrounding neighborhoods, as you yourself say, then I would understand that the reverse is also true, that people in Forest Hills can easily access other neighborhoods, other neighborhoods. So it's very easy to get from Forest Hills to Kew Gardens. It's very easy to get from Forest Hills to Jamaica, to the other areas leading up to Forest Hills. So I'm having trouble understanding what is your market? What is the geographic market that you are talking about? Our market, Your Honors, is Forest Hills, not Queens, not the entire borough of Queens. What makes that a market just because there's a section of Queens which is part of New York that happens to be called Forest Hills probably for good ancient reasons, but what makes that separate? First off, courts have regularly found that narrowly defined geographic markets, similar to the one alleged, are proper and viable. I don't understand why it is a market just because it's called Forest Hills. I understand. And that goes to our point, which is one of the second points that the district court stated in its dismissal of the case, was whether or not the theaters were in substantial competition. Our theater, the Cinemark, caters to a different clientele in a very different setting than the Regal Midway. And the Cinemark being at the other end of Forest Hills, away from the subway stop, away from significant traffic and foot traffic, caters to a senior citizen based community that makes them not in substantial competition to the Regal. And that defines our market. We have two theaters that are not in substantial competition. If they're not in substantial competition, then what's the problem for you? I mean, I would think that your problem would be that, yes, we would cater to the same market, to the same people. I'm not talking geographic market, but I'm talking about people. And because of the alleged practices of your adversary, you're not succeeding. But what you're telling us is that the clientele is different. And I'm out of time. May I finish? Please continue, yeah. The clientele is different. The theaters are different. The movie-going experience is different. The pricing, the Cinemark is significantly less expensive, both for ticket price and concessions. And, Your Honors, clearance over theaters where the clearing theater is not in substantial competition is an unlawful restraint of trade. That's the J.J. Theaters case. And U.S. v. Paramount Pictures and Justice Douglas' opinion in that. Yes, Your Honor. And with that, I'll... I have to say, just in truth and advertising, I have some familiarity with that neighborhood because I grew up there. Well, truth in advertising, I live on the Upper East Side and see most of my movies on the Upper West Side, which is a full Central Park area. So, may I ask... Are you worried about geographic market or are you using the Paramount Pictures test, which it seems to me may do a carve-out in this particular kind of case, where there are clearances? Yes. We believe that Forest Hills is a relevant geographic market and we could have clarified that in an amended complaint, which I'll say for rebuttal of my arguments of why we should have received leave to amend if the district court felt that we hadn't pled correctly. Okay. If it may please the court, as a resident of the District of Columbia, I will not talk about the meets and bounds of Queens geography in particular, but I do want to make a few points. First of all, going to the Paramount question that Judge Hall raised, you know, I think if you look at page 19 of the reply brief, there's a rather striking point. In that page, CVC admits that whatever this lawsuit might be about, it's not about so that it might compete for customers with Regal. That's a quote. You know, I don't believe that there can be an antitrust claim involving a plaintiff that it's no constraint on the defendant, let alone putting aside the fact that it seeks to carve out of its market definition all the theaters in nearby neighborhoods without any allegations as to why those theaters are not in the same geographic market. Do we know anything in the record that tells . . . I, again, from personal guesswork, I know that a number of movie theaters, not all of them Regal, running first run, features somewhere in Queens, but I don't really know that. Maybe I'm wrong. Maybe this particular movie theater is the only one within ten miles. How do we know from what's before us that you are describing this accurately? Yeah. Now, we submitted a Google map and asked for judicial notice of the Google map that shows . . . Can we take judicial notice of that map? I believe you can take judicial notice of a map. I want to come back to the Paramount question. You know, if you look at the Paramount case, that was a consent decree entered into by the district court that had all sorts of prophylactic measures. It involved a, you know, at that time, film distributors also owned exhibition theaters, and there were all sorts of vertical and horizontal collusion issues, and, you know, that was a consent decree. And if you look at the Supreme Court opinion in that case, it actually says, it goes to Paines to say, you know, we're affirming a consent decree here. This is not necessarily a statement of the prevailing law. Then when you . . . It does set out those factors that . . . It sets . . . . . . things to consider and adopt, so . . . But not as a question of evaluation of a Section 1 claim under the Sherman Act. Then if you go forward into the Sylvania case in 1977 and modern antitrust law, we've gotten to a point where all vertical restraints are evaluated under the rule of reason, and a fundamental precept of the rule of reason is that in order to state a claim, you must have a diminution of the competitive process. So, you know, the theory here seems to be that we've moved towards rule of reason treatment of all Section 1 vertical claims, yet there is still a per se rule for a clearance over a theater that is not in substantial competition. And respectfully, I would just suggest that any notion of that is, A, not dictated by Paramount, B, if you look at the J.J. Theater case in 1954, it did not hold that a lack of substantial competition could result in a finding of a Section 1 violation. Even back in 1954, it actually found the opposite, that if theaters were in substantial competition, there could still be an antitrust problem in some circumstances. And then you take it forward to modern day antitrust, and this kind of claim, that the geographic market that was not plausibly alleged, that simply can't form the basis for a Section 1 claim under modern jurisprudence, and there's nothing about the Paramount affirmance of a consent decree that dictates that it could. So that's what I would say about Paramount. I wanted to make just a couple of other points. What about, let me just move on, and I know you're moving on too, there is this Court's decision in Loralee, and under that decision, why shouldn't the plaintiff have the opportunity to amend its complaint? Well, I would say, as to Loralee, first of all, this is not like Loralee, because here, after having initial letter briefing before the District Court, after having a hearing before the District Court, the plaintiff here did amend. This was not a situation where the plaintiff never amended and was not given a chance to amend. And then, you know, we filed our opening brief on the motion to dismiss, pointed out in great detail the problem of the market definition, the problem of a lack of agreement, the problem with no allegations of harm to competition. They were on notice from the letter, from the hearing, and from our opening brief, never proposed a briefing before the District Court, any way they intended to remedy the problems with their complaint, even on appeal. It wasn't to the reply brief when they suggested some amendments they might make, but even those amendments coming on a reply brief on appeal would not solve their problems in failing to plead a plausible claim. What about your adversary's amended complaint? It alleges that identified individuals said that Riegel had threatened and coerced distributors into granting Regis the exclusive clearances. Why doesn't this allegation suggest an anti-competitive arrangement, especially when the complaint also alleges that individuals at each of the film distributors acknowledged that Riegel had obtained and controlled the clearances? Because there are no allegations in the complaint that are not simply consistent with unilateral action, Riegel taking the position that if a film is playing at the Cinemark, it does not want to play that film, and the distributors reacting accordingly. I mean, there are allegations of discussions with distributors, but there's no allegations that any of these distributors said, you know, we promised Riegel that if we gave a film to Riegel, we would not also give it to the Cinemark. That's perfectly consistent with Riegel taking a unilateral position and the distributors taking a unilateral position in response, just like Monsanto. Do you think that if there was such proof, and I'm saying hypothetically if there was such proof, would that make out a violation? It still would not make out a violation. If there was, you know, proof and agreement, that would be the agreement part of a section one competition. Yeah, okay. So then you'd get it to effect on competition? But you'd get it to effect on competition. You'd still have the problem of a lack of plausible allegation that Forest Hills is its own market for the reasons we've been discussing. You know, I would cite Judge Hall's opinion in Concord Associates as being sort of a similar dynamic. Sorry. No, no. No, that's fine. And you would still have the problem of lack of, you know, any harm to competition from the fact that, you know, the two theaters that admittedly do not draw from the same custom base are not showing exactly the same films. So if the allegation is that, you know, Regal came in and basically wanted to limit this distributorship for purpose of not having competition among two movie theaters, plaintiffs in your view would still have to show that there is some actual anti-competitive effect within a relevant market? Yeah. They would have to show that prices would be lower and quality would be higher for moviegoers in the relevant geographic market if they didn't have this agreement, if it weren't for the agreement. And that, you know, that ignores the other nearby theaters. It ignores the fact that they admit, I mean, it's hard to see how the fact that the Cinemark might be playing the same films as the Midway could have any effect on keeping prices down at the Midway or keeping quality up when, by their own admission, their theater does not draw and compete for the same customers as the Midway. That's all I have unless there's anything else. Thank you. Thank you, Your Honors. Mr. Alperin. Thank you, Your Honors. I will address some of my adversary's points, but I just wanted to state that we believe we could have clarified the geographic market in the complaint to be Forest Hills, Queens, and that would have been a sufficient market for this case. You say Forest Hills, Queens. Are you saying Queens were just Forest Hills? No. Forest Hills. You're just talking about the neighborhood, Forest Hills. Right. All right. As I understand, Mr. Greenfield's from Washington or from California. I'm from Vermont, so we've got problems there. How do you decide what's in and outside of Forest Hills? Is that an actual geographic definition or is it kind of a realtor's definition? My understanding is it's a geographical definition. Separate town, it's a separate zip code. Is there any way we can say, gee, we have now just stepped out of Forest Hills and into whatever's next? I believe it has defined boundaries. I don't know specifically, but I believe that that is the case. My question is who defined them, but yeah. Okay. As I said, other than that issue in the complaint, which I understand is an issue for antitrust law, that could be remedied, but the allegations in the complaint were sufficient to state a Section 1 claim. I think if they weren't, and the motion to dismiss was obviously granted, we should have been given leave to amend, and I believe that we were given the same Hobson's choice that this court found to be improper with the same district court judge in the Lorley decision. Your adversary, Mr. Greenfield, says you were given an opportunity . . . you were dealing with an amended complaint in the first instance. We were, but I believe . . . Why do you get another bite at the apple? I believe even though we amended prior to the motion practice, we were put in the same position as Lorley. We amended prior to having a fully briefed motion to dismiss and a judicial determination of the issues that were in the complaint, and I believe that our reply brief does supply additional facts such as we can clarify the market, we could add more facts to show the difference between the Cinemark and the Midway to show that they don't compete. Wasn't there a pre-motion letter from Riegel which directly contested this matter, and you addressed it in your letter reply brief, didn't you? That is correct, Your Honor, but still, without the formal judicial determination that our complaint was deficient, we did not know all of the areas that could be addressed in an amended complaint. Well, didn't they say during the hearing . . . didn't the judge summarize the arguments and summarize Riegel's argument as, and I'm quoting, contending that you haven't alleged facts that support an agreement or anything to suggest that there's been a demand and an agreement or an assent to that demand in this market? Well, I think that also during that conference, the court identified that we had set forth allegations of an agreement, and in fact, there was no discussion at that conference regarding the geographic market, so it was sort of understood what it was, and there was no contention to the contrary. Why is this . . . if I could ask you, why is this case in the Southern District rather than in the Eastern District? We had a discussion of that as well on the record. As Queens is in the . . . is it thinking about geographic markets, that's in the Eastern District. And from California, when we initially looked at it, we thought this was in the Southern District, which is why we filed there. The court looked at the matter and took jurisdiction. There was no objection from the defendants to that, but there was a discussion in balancing that issue. If I could make one last point, even though I'm out of time. Please go ahead. Thank you. My adversary made points that there could be unilateral decisions, business decisions, why Regal or the theaters . . . the motion picture companies made these clearances. The standard is, on a motion to dismiss, to accept all facts alleged in the complaint is true and give all inferences to the plaintiff. The court is not allowed to balance over whether the defendant's position is better than the plaintiff's. And my adversary also cites or stated the Monsanto case, which is a summary judgment or trial standard, not a standard for a motion to dismiss. Respectfully, Your Honors, this case should be remanded back for discovery, whether on the amended complaint or for leave to amend to submit a second amended complaint. And I thank you for listening. Thank you. Thank you. Thank you for your arguments. The court will reserve decision.